Spear, C. J.
The real question is, whether or not the contract, as explained by the other evidence, is without consideration, illegal and void.
As a first step at the trial, plaintiff sought to contradict and vary the terms of the written instrument by parol evidence, and for this purpose called McMillan, the assignor. The witness testified that he received no consideration whatever for the assignment of the judgment. In the light of bis further testimony, it is fair to assume that he meant by this only that he received no money consideration, and that *479 nothing was actually paid to him, for he proceeded then to state that the valuable services rendered and to be rendered, referred to in the agreement, formed no part of the consideration for the assignment. This statement, taken in connection with the whole testimony of the witness, is, after all, but an opinion — the stating of a conclusion of law. Rc stated further that the agreement Was entered into on the afternoon of November 9, and that before noon of that day he had made a complete settlement with Reece, as the receipted bill would show. The bill referred to, which covers several pages, extends over four years .of time, and contains a large number of items, is receipted thus: “ Rec’d payment of all above accounts.” This is.a complete settlement oí the items in the bill; it does not purport to be a settlement in full of all claims. Nor is it pretended that Reece had been paid his fees for obtaining the judgment save as appears by the bill. Among the items we find one of ten dollars which is a specific charge for services in the suit against the West Hamilton Company. It is possible that another charge of like amount is intended for services in this case, but if so, the two together would be an exceedingly meager charge, and wholly out of proportion to the probable work and the amount involved. By reason of some misunderstanding, as it appears, Reece was not present at the trial. This left the plaintiff opportunity to give uncontradicted proof, and make the best case possible. Had McMillan been possessed of facts which would impeach the writing, as to 'services past and to come, it is presumed he would have stated them; at least nothing prevented, No proof was offered by defendant, and so we have a question upon the un-contradicted evidence of plaintiff. The proof actually made, we think, is not of that high character required to overcome the statements of the written agreement, signed by the parties, as to past and future services, and the presumption that, under all the circumstances as shown, there was, at the time, an understanding between them, that Reece still had an unsatisfied claim for services in procuring the judgment, and that he had such claim in fact.
*480 This, then was the situation. Reece had an unsatisfied claim for fees in obtaining a judgment for McMillan. His relation as attorney, as to that judgment, had not terminated. His claim gave him an equitable interest in the judgment, and a lien upon it. It was of uncertain value. McMillan was impecunious, and, in fact, insolvent. He had, not the means to then prosecute farther, and, aside from that, was disinclined to do so because several stockholders of the Hydraulic Company were his relatives, and hence he wanted to dispose of the judgment. Reece was willing to take an assignment of it coupled with the obligation to proceed to enforce collection by action against the stockholders, within his discretion, at his own expense in the first instance, but if not made by the anticipated proceeding, then one-half the expense to be repaid by McMillan, and the net proceeds, if successful, to be equally divided. The effect of the assignment, if legal, was to make them joint owners of the j udgment, the legal title being in Reece. If the parties could not legally enter into such a contract, then the judgment of the circuit court'is right; if they could, it should be reversed. There is no question of fraud as between debtor and creditor, nor of undue advantage, or bad faith between attorney and client, in the case; nor can wé assume, considering the doubt as to the collectibility of the judgment, and the character of the proceeding which it would be necessary to prosecute and maintain in order to enforce it, that the contract was unreasonable,
The contract is assailed as being without consideration, and champertous. If the agreement was illegal, because champertous, then there was no consideration, and the contract was void. So, there is at last, but one question, and that is: Will a promise by an attorney to render legal services in an effort to collect a judgment, for obtaining which the attorney has not been fully paid, and to advance costs and expenses in the first instance, one-half to be repaid by the client in case of failure, form, as between attorney and client, a valid consideration to support an assignment oí a judgment, the net proceeds of which are to be equally divided in case of success ?
*481 Maintenance is defined to be an officious intermeddling in a suit that no way belongs to one, by assisting either party, to the disturbing of the community by stirring up suits; champerty, a species of maintenance, being a bargain with a party to divide the land or other matter sued for between them, if they prevail in the suit which the champertor undertakes to carry on at his own expense; though if a man have any interest, however slight, in the subject of the matter about which the suit is to be brought, or is depending, the aid given has been held not to be maintenance. Statutes in relation to maintenance and champerty were first enacted in England at an early day. Additional legislation was found necessary during the. reign of Henry VIII. It. was common then for nobles and other powerful men to take transfers of pretended rights in action, especially of lands from persons not in possession, and prosecute them, to the great oppression of the weak. Juries were made up, in large part, of the dependents of such-men, and the processes of law were thus converted into engines of oppression. The statute of 32 Henry recites that “ the King our sovereign lord, calling to his most blessed remembrance, that there is nothing within this realm that conserveth his loving subjects in more quietness, rest, peace and good concord, than the due and just ministration of his laws, and the true and indifferent trials and issues, as been to be tried according to the laws of his realm, which his most royal Majesty perceiv-eth to be greatly hindered and letted by maintenance, em-bracery, champerty, subornation of witnesses, sinisterlabour, buying of titles and pretended rights of persons not in possession, whereupon great perjury hath ensued, and much in-quietness, oppression, vexation, troubles, wrongs and disinheritance hath followed among his most loving subjects, to the great displeasure of Almighty God, the discontentation of his Majesty, and to the great hindrance and let of justice within this his realm,” The buying of pretended titles by those not in possession, and acts of champerty and embrac-ery, were, by this statute, forbidden under penalty of sweeping forfeitures of lands, the one-half to go to “ the King, *482 our sovereign lord,” to relieve, it may be respectfully presumed, the “ discontentation,” referred to.
That there was necessity for such statutes, the history of that time, as gathered from Hume and other historical writers, as well as from law writers, sufficiently shows. Hume says: Instead of their former associations for robbery and violence, men entered into formal combinations to support each other in law suits, and' it was found necessary to check this iniquity by act of parliament.” And, speaking of the subject, Coke says: “Nothing in action, entry or re-entry, can be granted over, for so, under color thereof, pretended titles might be granted to great men, whereby right might be trodden down, and the weak oppressed.” Rights in action were forbidden to be transferred “ lest justice should fail and oppression result.” But, as methods of judicial procedure improved, and a firmer and purer administration of justice was attained, and popular rights received wider recognition, the mischiefs complained of became less apparent, and the enforcement of such statutes became of less and less importance. Then followed judicial modifications and exception to the sweeping inhibition of the statutes. Exception was made where the person maintaining and the suitor stood in some social relation, as that of relatives by consanguinity or affinity, master and servant, or landlord and tenant. Other exceptions are adverted to by Mr. Justice Butter, in Master v. Miller, 4 D. & E. 340-1 (1791), as follows: “It is laid down in our old books that for avoiding maintenance a chose in action cannot be assigned, or granted over, to another. The good sense of that rule seems to me to be very questionable; and in early as well as modern times it has been so explained away, that it remains at most only an objection to the form of the action in any case. * * It is curious and not altogether useless to see how the doctrine of maintenance has from time to time been received in Westminster Hall. At one time not only he who laid out money to assist another in his cause, but he that by his friendship or interest saved him an expense which he would otherwise be put to, was held guilty of maintenance. Nay, if he officiously gave evidence, it was maintenance; so that *483 be must bave a subpoena, or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should be soon laid aside, must be expected. Accordingly a variety of exceptions were soon made; and amongst others it was held, that if a person has any interest in the thing in dispute, though on contingency only, he may lawfully maintain an action on it. 2 Roll. Abr. 115. * * * So an assignment of a chose in action has always been held a good consideration for a promise, 1 Id. 29; Sid. 212, and T. Jones, 222; and lastly, by all the judges of England, in Mouldsdale v. Birchall, 2 Black. 820, though the debt assigned was uncertain. After these cases, we may venture to say that the maxim was a bad one, and that it proceeded on a foundation which fails.”
Among the reforms in England may be mentioned the enactment of statutes for the limitation of actions, the statute of frauds, the extension of the action for malicious prosecution, and that for awarding costs against unsuccessful parties, all which have been passed since the acts relating to maintenance. These changes have contributed materially to the discouragement of groundless and vexatious litigation, and it has resulted that the law of maintenance as originally understood and enforced in England, has been essentially modified, and is said by Story, (Contracts §711,) “to be now confined to cases where a stranger, having no interest in the suit, improperly, for the pupose of stirring up litigation and strife, encourages others to bring actions, or make defences which they have no right to make,” citing Eord AbiNGER, in Findar v. Parker, 11 M. & W., 675.
In several of the states of the union statutes have been passed making maintenance in varying forms unlawful, while in other of the states the doctrine is scarcely recognized even by the courts. No statute similar to the English statutes has ever been enacted in Ohio. Champerty has, however, been the subject of judicial inquiry, and has been held to avoid contracts in which it was present. In Key v. Vattier, 1 Ohio, 182, the vice of the contract was that the attorneys were to save and keep the client harmless from all costs and charges, and no compromise was to be made ex *484 cept the attorneys join in it. In Weakly v. Hall, 13 Ohio 167, the debt was released by the creditor to the debtor, after assignment by him under an agreement by which the assignee, not a lawyer, engaged to collect the claim in the assignor’s name, to employ counsel, advance all money, procure bail, etc., reimburse himself for his allowances from the proceeds when collected, and receive a portion of the avails for his compensation, and the court held the release effectual, although suit had been commenced and money expended in accordance with the contract. In Stewart v. Welch, 41 Ohio St. 483, by a divided court, it was held that a contract whereby the claim was assigned to Welch, who brought suit in his own name, could not be enforced, it appearing that the contract was made for the purpose of carrying on litigation without expense to and free from control of the assignor, who was to receive nothing except a share of the recovery.
It will be noted that there are important distinctions between these cases and the case at bar. In each case the suit was to be prosecuted wholly without cost or expense to the original owner of the claim, and it does not appear that the party maintaining the contract had any interest in or claim upon the cause of action other than that given by the assignment. So that, for the purpose of nullifying the contract between McMillan and Reece, we are asked to take a step in advance of previous decisions. Ought this to be done?
It is difficult at best, to reconcile the strict law of maintenance and champerty with our ideas of the rights of property, and the right of the citizen to contract. Among the fundamental rights is the right to acquire, possess and dispose of property. The right of disposition necessarily inheres in the right of ownership. We are taught that a chose in action is as much property as a thing in possession, and that in this day the right to dispose of such property is as high and free from doubt as is the right to sell the horse, or farm of which the seller has manual possession. And if one may lawfully dispose of such property why may he not *485 dispose of it upon sucb terms as to him may seem advantageous?
That tbe consideration received by McMillan is a promise by Reece cannot be fatal to its legality. It would be conceded that McMillan might have assigned his judgement upon Reece’s written agreement to dig a ditch, or plow a field, or build a house. So, too, Reece might have agreed to sell his legal services for a promise by McMillan for some labor or service on his part. And yet, while either can purchase of the other, there appears, under the early decisions, an insuperable objection to the valuable thing which each has, being the subject of barter between them. Upon reason, the objection would seem to lack substance. It has been based upon grounds of public policy.
Of course, if a proposed contract is clearly against public policy the courts will say it cannot be entered into. But why, applying this test, should we limit the subject of contracts for compensation otherwise than by discriminating against transactions which are prohibited by statute, or are immoral, or hurtful, in their nature, in the sense of contravening some established interest of society? That contracts similar to the one at bar were regarded dangerous three or four hundred years ago is not a powerful reason for so regarding them now, when we consider that social conditions, and the law in other important respects, have undergone radical changes. Fortunately the condition of society to-day is on a higher plane than in the chaotic times of the 8th Henry, our judicial methods are more enlightened, and the 'day of combinations among the powerful to oppress the weak in the courts has gone by.
It will be borne in mind that great scrutiny was given in England to the acts of counsellors and attorneys, because of the peculiar relation which .the law placed those officers in with regard to their clients. The former were incapacitated to make any contract for compensation with the client, though he might accept a gratuity, while the latter might make such contract only as the law had made for him in fixing for every service a corresponding fee. A contract, therefore, between a counsellor or attorney, and his client, *486 for a share of the thing in suit, would have been invalid on this ground, as well as' others. No such strictness ever obtained here. Our laws have always recognized the right of either to compensation for his legal services, in a reasonable amount, either on a quantum, meruit, or upon special contract. Beyond this, the propriety of accepting compensation by way of a fee contingent upon the event of the suit, and payable out of the thing recovered, has been recognized. Also the advancing by the attorney, for the benefit of the client, of funds in payment of costs and necessary incidental expenses. Indeed, such advances by the attorney in the progress of litigation, is so common that to denounce the practice as improper would be to condemn the daily acts of the most honorable members of the profession. Wylie v. Coxe, 15 How. (U. S.)415; Stanton v. Embrey, 93 U. S. 548; Allards. Lamirande, 29 Wis. 502; Newkirk v. Cone, 18 Ill. 449; McDonald v. Railroad Co., 29 Iowa, 171; Quint v. Mining Co., 4 Nev. 304. This upon the idea of duty on the part of the profession to investigate the claims, and give professional aid in redressing the wrongs of the indigent who have been injured, for in this way many poor people are enabled to obtain justice, where, without such aid they would be remediless. And it has been considered that there is no practical distinction between such an arrangement and one where counsel undertake, for an agreed fee, to be paid in the future, the prosecution of a case for a client so poor that unless the cause be gained the attorney could not possibly realize any compensation whatever. That a contract of the latter kind is legal was held in Moore v. Trustees, 9 Yerg. 115.
As before' stated, we have never had in Ohio, any legislation upon that phase of maintenance known as champerty. But the evil of stirring up suits and controversies whereby persons should be defrauded or injured was early the subject of legislation. By the act of February 10, 1824, the encouraging, exciting, and stirring up of any suit, quarrel or controversy, between two or more persons, by certain named officers, including attorneys and consellors at law, with intent to injure such persons, was made an offense *487 punishable by fine of not more than $500, and liability to the party injured in treble damages, which, as to the penal sanction, is the law to-day. It would seem that the terrors of this act would be sufficient to protect the people from any vestige of the evil tendency to combinations by the strong to injure the weak by oppressive litigation.
The conduct of attorneys is subject to proper scrutiny by the courts. The maintenance of a high character for dignity and integrity on their part, is essential to the security of community, and the due administration of justice. Any infraction of the letter of this statute would entail its penal consequences upon an offending attorney, and the courts would not hesitate to hold void any contract violative of its spirit, whether coming within the strict letter or not. So, too, the courts have been, and continue to be, careful not to sanction contracts which appear to encourage a gambling spirit, one leading to the prosecution of pretended or obsolete claims, for a possible high reward. And anything like sharp practice, or the taking of undue advantage by the attorney of the confidence or necessities of the client, would meet with no favor nor mercy at the hands of the courts. At the same time it would not be wise to carry rules adopted 'originally for the purpose of preventing the powerful from oppressing the weak by groundless suits in the courts, to the extent of hindering the weak in efforts to avail themselves of lawful remedies against the powerful, now that the conditions making the ancient rules necessary have substantially disappeared, and new conditions arisen by reason of which it has become the interest of the powerful to embarrass and hinder the dependent and weak from obtaining speedy justice in the courts. Nor would it be judicious to extend arbitrarily those rules which say that a given contract is against public policy, for men of full age and competent understanding ought to have the utmost liberty of contracting. Their contracts when entered into fully and voluntarily, should be held sacred and should be enforced by the courts, for it is a paramount public policy that courts should not lightly interfere with the freedom of contract. Sir G. JESSER, in Printing Co. v. Sampson, 19 L. R. Eq. Cas. 46 2. *488 It is much more easy to denounce, in general and sweeping terms, contracts said to involve champerty as “odious,” and “worthy only of the severest condemnation,” than it is to point out wherein it is wrong to make an effort, under the circumstances disclosed in the case at bar, to enforce a claim solemnly adjudicated by a court to be just and legal, by one who has an interest in the judgment because of services rendered in obtaining it. It is difficult, also, to perceive how such a proceeding would contravene any established interest of society, or tend to corrupt the fountains of justice, or bring the legal profession into disrepute.
Decisions by courts of other states have been cited. We have examined them. Many are based upon statutes, and have but little bearing in this state. Others 'are in conflict, and cannot be reconciled.
The holding in the recent case of Penna. Co. v. Lombardo, recognizes the doctrine that a champertous agreement is against public policy, and void. As it is not stated -what will constitute champerty in an agreement, it is to be inferred that the doctrine is governed by previous holdings; and the point determined is, that, whether the contract between Eombardo and his attorney was shown to be cham-pertous or not, his claim against the railroad company was not affected by it. It is not necessary, in order to dispose of the present case, to unsettle the Uombardo case, nor any of the previous decisions of this court, and there is no purpose to do so. Nor is it necessary to formulate any new rule on the subject. Each case as it presents itself may be safely left for disposition on its own peculiar facts. We are not, however, disposed to go farther in enforcing the ancient rules, than the decisions by this court have heretofore gone. In the present case, if the contract rests upon a consideration which the law will sanction — and, for reasons heretofore stated, we think it does — there would seem to be an end of the inquiry. The promise to advance costs in the first instance is neither illegal nor improper, and the agreement to pay one-half the costs by Reece was no more than, being owner of one-half the judgment, he was in fairness and equity, bound to do. We conclude that the contract has not *489 been shown to be wanting in consideration, or otherwise invalid.
Other questions were raised by plaintiff in error, but we do not regard them of sufficient importance to warrant discussion.
It follows that the judgment of the circuit court should be reversed, and the petition dismissed.

Judgment accordingly.